Good morning, ladies and gentlemen. Because of a number of circumstances where conflicts with counsel's schedule and cases going submitted, we only have two argued cases before the court today, which is very unusual for us, but we're happy it'll be a short morning. So the first case, Case No. 171851, C.R. Bard v. Angiodynamics, Inc., Mr. Belusco, did I pronounce that correctly? Belusco. You want five minutes for rebuttal? Yes, please, Your Honor. Okay, you may begin. Thank you. May it please the Court. I have three points I'd like to address today. The claim construction issue, specifically with respect to the 302 and 022 patents, but also Claims 8 and 9 of the 615 patent, and the public accessibility issue with respect to the ISO-ED reference, and finally, with respect to the 615 patent, the Board's modification of the examiner's rejection on new grounds did not give an opportunity for fair hearing and should be vacated. Let me start, though, with the claim construction issue, which is the paramount issue here. The patent claims... Can I just ask you on that? Assuming you're correct that the implication of the language is that the device actually has to be power injectable, why is the Board, even on that assumption, wrong about obviousness? Well, because the ISO-ED reference, which is relied on for anticipation of many of those claims, and obviousness is the primary reference on the others, is not power injectable. But, so, the question is, is there evidence in the record from which one could conclude, especially in light of your spec that talks about power injectable and non-power injectable boards, could the Board have reached the conclusion that even if the ISO-ED wasn't power injectable, that it would have been obvious to shift from one to the other? No, Your Honor, I don't believe so. There's nothing to indicate. As a matter of fact, the ISO-ED reference itself points out that there is an issue with high pressure, and that's in the record, and so you would never use a structure like that. So the idea that you would modify that particular pump, which is used to... I guess maybe I'm confused about a premise. I thought it was undisputed that there were, in fact, power injectable ports in the prior art. There may have been ports that were capable of power injection, yes, Your Honor, but it was not ISO-ED. Right, so it's not ISO-ED, but there were, undisputed, prior art, there were power injectable ports. Assuming ISO-ED is prior art, maybe even without ISO-ED, having an x-ray readable tag saying, here is what I am, was also in the prior art. Why is it not obvious to put one of those tags on the prior art power injectable ports? Well, there is no art that indicated putting on such an indicator, a radio-update indicator, to indicate something was power injectable at all. Isn't it obvious that, since, as you say, it's very important for the user of the device, who can no longer see it with his eyes, to know what the thing is under the skin, to have an x-ray readable identifier, self-identifier of whatever the device is? There is no evidence in the record to indicate any ports were indicated for power injection, specifically, and this power injection procedure, as your Honor may be aware, is a separate function for these ports. Traditionally, the ports, such as ISO-ED, were for putting in chemotherapy drugs at very slow, even paces. This need for a port that could take high pressure came about because you want to do a CT scan where you need to put in a lot of contrast in a short period of time. So if the board made no findings with respect to motivation to combine anything in the prior art, if we concluded that you're right on the claim construction, and so therefore, under the APA, we couldn't affirm, based on the grounds that the board relied upon, wouldn't it be appropriate to remand for the board to consider obviousness in light of the correct claim construction? Well, that's certainly a possibility, Your Honor. But I submit that I don't think there's any showing that it would be obvious. There's no motivation to combine, nor, I believe, is there anything in the record that's going to indicate such a motivation to combine with the references there. Do you agree that ISO-ED teaches a radiographic tag that identifies the model number and also the flow rate? Yes, it does. It indicates that it has a very low flow rate. But it indicates something. There is some self-identification in ISO-ED. Yes, it does, Judge. So, there's two aspects to the claim construction issue, and the first one you've hit upon already, of course, is it power-objectable? And we certainly say it is. But the other has to do with the board's throwing out as printed matter the radiographic indicator. The radiographic indicator is something that is not printed matter that can be given no patentable weight. Why not? So, we have, including in ISO-ED, the physical structure of an x-ray readable message vehicle. Yes. And the only thing that's different here is the words on that vehicle. I am this rather than I am that. In what way is simply saying, this is what I am, outside the printed matter? Well, because first off, as you indicated, even in ISO-ED, it is something that's etched or printed in some way on the metal itself. It's taught in the patent. It's etched into that metal. That indicator is part of the substrate. It's structure. It's not merely printed matter. That's old. Even assuming it doesn't, as I understand the printed matter analysis, it's a two-step. One, is it printed matter? Yes. And that depends on whether it has a functional relationship to the substrate. But even if it isn't, whatever that is has to still be novel, new, non-obvious. So why wouldn't this form of descriptiveness fall outside the second prong? Well, the second part, it's given patentable weight. Now you're into the obviousness determination. So if it's given patentable weight, then the issue is, well, is there such an indicator indicating something is power injectable? And there's nothing in the record of any art, of anything radiopaque, indicating a particular vascular access port is power injectable. And that's a very important thing because of the harm and even fatalities, which were recognized by the board, could happen if you try to power inject something that is not power injectable. In the ISO-ED reference, when it identifies the model and the flow rate, is that, in essence, identifying to a doctor, hey, I'm not power injectable, so don't power inject into this port? Absolutely. It's telling you the opposite. It's not telling you the positive that we have in the claims. But the more you keep focusing on what seems absolutely at the heart of the printed matter doctrine, which is the content of the message. If it says one thing, you say the specific content on exactly the same structure, assuming the same structure, because it says what I am is a power injectable port, instead of I am not a power injectable port, that that changes, that counts for patentability. Isn't that exactly what the printed matter doctrine has always been about? No, because this is still functionally related to... In any way that's different, and maybe your position is it's the same, the label on any bottle of clear medical liquid... The label? Right. You take any... You have a whole row of little vials, and they're all clear, and some of them have 0.5% opium or something in them, and the other, 90% opium, and it's really, really important that the user know which it is, and you can't tell it visually, so you put a label. Does that really change the patentability of what's in the bottles? First, it's not just a label. It's something that's on the substrate. It is part of the structure. I think you're evading the question. It's old to put a label of some sort inside on a device when it's under the skin so that people can use x-rays to see it. You keep coming back to, but this label says it's power injectable. Content of the label is what you keep coming back to. How is that different from different content on labels on any bottle? Well, we'll start with the premise that then, if it is something that is on the substrate, we're out of printed matter. Now we're dealing with obviousness. Because it's part of the structure and it has a functional relationship. I think that's really the heart of the question. So you would agree, I take it, that the tag in isometh is functionally related to the substrate? Yes. Okay, so say you've got two different identifiers that are functionally related to the substrate, and the question is why it wouldn't be obvious to say one is that what, it wouldn't be obvious to say, you've said I'm not x, why wouldn't it be obvious to say I am x? Well, there's nothing to indicate that you'd ever want to say that I am power injectable. That was out there before. But there is something in the prior that says I'm not power injectable, so don't use me or you might cause... Cause harm. Cause serious harm. But how is that any different? Why isn't that prior disclosure evidence of obviousness of also saying I am power injectable, so you can use me for this purpose? Well, because when it does say that I am power injectable, that permits then the medical practitioners to actually use it for its purpose. Otherwise, they don't see it. And that goes to the second part of the board's construction, which is whether or not this port has to be power injectable and whether or not there's anything in the prior art that showed the use of power injectable ports. Yes, that's absolutely right, Your Honor. Before we use up all your time, I do want to talk about printed matter. So, yes, it's not the best declaration I've ever seen in my life. Are you saying accessibility, Your Honor? Accessibility, I'm sorry. So, it's not a great declaration. No, it isn't. But the board found it to be sufficient. The board found it to be credible despite the admitted bias. So why don't we have to defer that finding? Well, first off, it's supposed to make it so that one of skill in the art can find it. If you really look at what is described in the declaration, it talks about providing this to particular doctors and others. But the only reference to what is one of skill in the art here in the record is a medical device designer with many years of experience. But don't our cases say that it's not just one of ordinary skill in the art, it's persons interested in this technology? I would say yes, but the person interested in this technology for the point that we're looking at here would be such a medical designer. Moreover... So would you say that no matter how widespread the distribution was to the users of the technology, like doctors, that it would never qualify under the public accessibility? Well, I would say if it's not getting to the right people, it doesn't matter to whom you give it. But the other thing about this is, while it's distributed, as it's said here, how would one find it? The issue is how could one find it? So a person interested in these products, I assume, would go out into the marketplace. Maybe there's even a website, maybe there's an FDA website, and say, who makes access boards? And they say Medtronic. And I think you conceded that anybody who saw it, upon asking, would get the Medtronic brochure, whatever you call it. Yes, what we said is anybody who got the brochure could then see where to get the brochure. But that's kind of a circular thing. Well, I'm not sure it is circular. If somebody is interested in what's out there in the marketplace, don't they look at what's out there in the marketplace and then they say, I want to know about details. Ask the manufacturer. Well, there's certainly no evidence in the record that you could go find it on a website or anything. There's nothing like that here. The only evidence is that one person... Is that Medtronic was actively marketing a product. Somebody interested in the product could get the brochure. Why is it not trivial to... Do you contest that somebody who held in his hand the Isomed Medtronic product would, could, I'm not sure what the right verb is, ask Medtronic for, what, a hundred page or more documentation about it? If you have the product, I assume you could ask for a user manual for the product. Yes. How do you distinguish enhanced security? Well, I think enhanced security actually points out, perhaps, that there are certain holes missing here that aren't necessarily missing there. Although there may have been holes in what inferences you can take. I thought there were holes there, but I didn't win. Yes. Well, I agreed with you on that. Be that as it may. Really, the only thing that came out of the declaration, if you really look at what the findings were, that was that the board found that Isomed was available to any member of the relevant public who requested a copy from Medtronic. That's what's there. And again, it starts with, we've got to have it to ask for it. And so we don't have anything here that fills in all the holes of who, when, where, how. Your recent GoPro case, for example, had a litany of stuff in terms of how that was out there. A lot of evidence. In a re-examination proceeding, how much is needed for what seems on its face like a quite familiar situation? A product is out there in the marketplace. Somebody interested in the product would think of asking the manufacturer, do you have literature on the product? Well, Your Honor, I would suggest... And you don't dispute that if somebody asks, Medtronic is delighted to give it because it makes it more useful. Maybe they'll sell more of them. Absolutely. Well, assuming they're an interested person, and I think they should be, when it's still in the art, the question about a re-exam procedure, it should be more. And the reason for that is, we're not even in a position in that re-exam procedure to take the deposition here. So how are we going to check these facts that a, at least biased person, puts in a declaration? I hear what you're saying, but also, isn't it true that the examiner just has to make a prima facie case, and then you have to bring forth evidence? It's not as if there's a burden of proof issue in this kind of examination by the patent examiner, right? I believe that's correct, but I do believe that it ultimately is for the patent office to do something here and to just rely upon a declaration provided by the other side's employee does not seem to be sufficient here to meet the requirements that this was truly public accessible to an arrested person. And this patent issued before the AIA, right? Yes, it did. We'll restore five minutes for rebuttal. Okay, thank you. You're lucky we don't have many cases. Good morning, your honors. May it please the court. My name is Danielle Tully, and I'm here today with my colleagues on behalf of Cross Appellant Angiodynamics. Can we start with the public accessibility question? Yes. So, my question is, to what extent can we rely upon the disclosures in the document itself for purposes of determining public accessibility? Well, I think that as this court found in Gopro, the test for public accessibility is actually a flexible standard. So I think that the court would be right to look at the face of the document itself. And here, we don't have a dispute that IceMed was in fact a publicly sold and used device that was on sale and actually used by doctors before the critical date here. There's also no dispute that the IceMed manual itself was authored and distributed by Medtronic. My friend just conceded that somebody who actually wanted a copy of the manual could have gotten it from Medtronic. But when you say no dispute that it was distributed. Yes. So we have one declaration from one of your employees who says, I used to work for a third party distributor and I gave out what, several of these? It was so nonspecific. He didn't identify any doctors. He didn't say how many. He just said, I gave them out. He said voluminous, whatever that means. Right. Why is that enough from an evidentiary standpoint? Certainly, in a court of law it would certainly not be enough to satisfy an evidentiary burden. Yes, Your Honor, and I think that maybe in some circumstances that wouldn't be enough, but not in these circumstances. The declaration itself is not the only piece of evidence we have here. BARD is asking this court to treat it as if it's the only piece of evidence, but it's not. Actually, we have a device and a manual for a device. Devices are sold with product manuals. A relevant person would know that they could get a copy of the manual from the device manufacturer. But you didn't have any evidence that any one of these devices was actually sold with a manual. It's undisputed in the record that the device is sold, and I think that it's understood that devices are generally sold to the public by a device manufacturer like Medtronic with the manual for use. Where is that in the record? I believe the board found at the findings of fact. The board says that Medtronic itself actually said... Which page are you on? What paragraph? I apologize. Findings of fact. It's around appendix page 12. Appendix page 12. Which paragraph? If we start with paragraph 10, actually on appendix page 11. Where specifically does it say that Medtronic had a practice of selling products. Every time it would sell a product, it would give the manual. Where is this kind of stuff? In paragraph 10, it says that ISOMED itself says that ISOMED was prepared by Medtronic for distribution to physicians and allied professionals rather than for internal or restricted use within Medtronic. The board based that finding on ISOMED's statement that ISOMED has been developed for physicians and allied professionals who care for patients using the ISOMED system for hepatic arterial infusion. That just says that the device was developed for physicians and allied professionals. It doesn't say anything about sending it with a manual. That's actually the statement from the manual. The statement that the board is quoting there is found in the manual. But the board is just saying that that statement is evidence that it was for use for public use as opposed to being for internal or restricted use. That's the only thing they found. I believe that the board went on to conclude that the board was relying on the document itself rather than actual facts relating to distribution. To what extent can they say, I look at the document so it was probably distributed. How is that good enough? I think here where the document is actually a manual for a medical device, medical devices are typically sold with product manuals. Where is that in the record? The board inferred it from the fact that LaForce actually sold the device and handed out the manual with it. One of the things that's frustrating about the record is that the amount of detail provided in the declaration or if there weren't supplemental declarations that could have been obtained to say these things, that you're asking the board to infer and asking us to find supported by those exact statements in the record. And while I agree with you, your honor, that the statements... So can I understand, I understand the only evidence here is just the one declaration and then the document itself. There's nothing else that was relied on to show that this was publicly accessible. Well the board also inferred from the contact information that was in the document. But that goes back to it's in the document and you don't have any... I mean just because a document exists doesn't mean it's publicly accessible. That's the problem. That's correct, your honor. But the board did find that on the totality of the circumstances here that there was sufficient evidence to conclude that under the flexible standard that this court has articulated that the document would have been accessible to a member of the relevant public who exercised reasonable diligence to get a copy. And so just to answer my question and make sure it's understood the only thing that you put in the record to show this is the one declaration and the document itself. Is that correct? That's correct, your honor. That's the totality of the evidence here. We don't have evidence or findings about how many units of the product Medtronic distributed before the priority date. Is it a popular product? Were there only four in the entire world? There's no specific evidence in the record of the number of isomid devices that were sold here. However, Bard does not dispute that isomid was in fact sold and used before its critical date. Right, but if the basic theory which as an abstract matter makes a lot of sense that a widespread product particularly a medical device in which for which details matter about how you use it that there were a lot of them and that they pretty much were always accompanied by the manual or whatever one calls this thing why should we not send it back? I mean, I'm going to assume that those would be relatively easy facts to either prove or disprove. Well, there is some evidence of that in the LaForce declaration. LaForce does say that he personally sold... Was the word numerous? It was the word numerous. He sold numerous devices themselves and he also distributed... Given that he works for you and given that you put the affidavit in, the weakness and the thinness of the affidavit seems to be even more suspect. And so that's what I'm so surprised at. I mean, if there really was all this evidence and that he could identify who he sold it to or how many times he sold it, then why isn't it in the affidavit? Your Honor, I believe that the board actually considered the potential bias and they still credited the affidavit. I think the potential risk here is creating a rule that when there's a product manual that there's somehow a heightened burden of proving how many of the products were sold. Well, the risk is assuming that just because a product manual exists that it was ever publicly accessible. And that's a really different question because we don't have any evidence other than this affidavit that the product manual was ever given to anyone. Regardless of whether the product was sold. A lot of times products are sold without product manuals. Yes, Your Honor, and I do understand that, but I believe that the standard that the court articulated recently in GOPRO is that we don't need actual evidence that it was ever accessed by any particular member of the relevant public, just that it could have been accessed by the relevant public based on the totality of the evidence. And I believe that the board properly credited the evidence that's provided not only by the declaration, but also by the manual itself that shows that somebody who was interested in Isomed could have obtained a copy from Medtronic. This doesn't change the result here, but do you think there's a difference between pre AIA cases and public accessibility of post AIA cases? I do not, Your Honor. I believe that the standard would be the same. So let's turn to the claim construction. Part of my problem with the board's finding is that it's a straight up grammatical one. The claim itself says the alphanumeric message indicating that the power assembly is power injectable. That is seems to be a pretty strong phrase. And you're saying the board says, well, it didn't have to really indicate. It says it's power injectable, but it could have not been power injectable. That doesn't even make any sense. Well, that's actually not quite our argument. Our argument is that all BART is pointing to is the content of the information conveyed to distinguish the art, but all of the structure, all of the port structure that BART has claimed is rudimentary port structure that was long known in the art. The septum, the outlet stem, the reservoir, the housing, all that structure existed, and we've shown that in BART, it's actually not power injectable. We're saying that based on BART's disclosure, we don't know what power injectable even, how to distinguish a power injectable port from the art. Even if you take BART at its word that its port is somehow different, there's nothing in its claims or its disclosure that distinguishes over the art. They've only claimed the same rudimentary structure with known identification techniques. So what you're saying, so that the board's finding that it could be a non-power injectable port, even though the language says that is power injectable, you're saying that's not really what the board found? I'm saying that the board found that BART couldn't simply distinguish by pointing to the content of its label. That doesn't change its claim structure. The board Why doesn't it claim that? We've got to start with the words of the claim, and that we also have the prosecution history that makes it clear that they were distinguishing non-power injectable from power injectable, and that there is, you know, a very big difference between the two. So why is it that we should ignore the words that is power injectable and say, well it could have been not power injectable and we could have accidentally told a doctor that it is power injectable? That doesn't even make any sense to me. I think that going back to the prosecution history as your Honor pointed out, all that BART points to in the prosecution history is that they amended the actual content of the information that was to be delivered by the radiographic marker. Originally the claims as filed said the radiographic marker indicating information about the port. All BART did is fill in the blank about the information. It could have been any information. I guess I'm a little confused. Do you think that this claim requires that the device be a power injectable port? I think that BART can't simply point to the... No, can you answer I think the question I asked. Do you think that this claim requires that the device be a power injectable port? The answer to the case doesn't stop at the answer to that question. What's your answer to that question? I don't believe that the claims define what a power injectable port is. That doesn't answer the question. Then I'm sorry. Does the device claim have to be a power injectable port? Whatever that may mean. Even if it has to be a power injectable... I guess I'm sorry. I don't understand your question. I think you have a very whole separate argument that even if it's a power injectable... That it would still be obvious. I'd like to get past the first point. Do you think that this has to be a power injectable port? So that the label is truthful. I answer Dynamics personally. We do not think that it has to be a power injectable port. But if it does, even assuming that it does, as your Honor said, all of the structure that is claimed would have been found in the art. All of the port structure exists in the art. Let's assume we disagree with you on whether it has to be power injectable. Disagree with the Board on whether it has to be power injectable. What then does that mean with respect to the Board's finding of anticipation? I don't believe that it changes the Board's finding with respect to anticipation. The Board actually said it doesn't need to determine whether or not any of the prior art ports were power injectable because all of the structure is there. But wait, what if we say no, the claim requires that it be power injectable? Then I believe that it would still be found in the art because a port with a separate... It's still anticipated by the anticipated by a non-power injectable port? It would be anticipated by a port with the structure as claimed. So the structure as claimed... That's separate. You're making an enablement argument and the Board didn't go off on saying, well you didn't tell us what power injectable really means. So what the Board said is this could be non-power injectable and the designation calling it power injectable could just be wrong. And assuming we don't agree with that, where does that leave you? I mean, what is your best argument that even if it has to be power injectable, that any of the Board's findings could stand? Anticipation, obviousness, any of them? I believe my friend stood up here earlier and said that there was evidence in the art and they don't dispute that some of the ports were actually being used for power injection. But the only actual anticipation point was... And I don't think the Board ever made a finding which would be required for anticipation by ISOMED that ISOMED showed a power injectable port, right? No, they did not. They actually said they didn't need to decide whether or not ISOMED was power injectable. So that particular finding on the assumption we're now operating on could not stand if only for lack of findings on that point. And under the APA we have to... We can only affirm based on the grounds that the Board relied upon, right? The Board also affirmed for certain 103 combinations. It wasn't just 102 with ISOMED, but the Board actually pointed to additional ports that were part of the record here. Okay, so let's talk about those. So were there findings of a motivation to combine a non-injectable port with a... I mean a non-power injectable port with a power injectable port? The motivation to combine there is actually based on the disclosure of radiographic markers in both the... in the Jones port as well as... Okay, but that's only one piece of it. So that addresses the first phrasing, the alphanumeric messaging. What about use of a power injectable port in this radiographic circumstance? Your Honor, Your Honor is correct. None of the prior art actually says that the ports were power injectable. That's not in the record here. So a remand would be required? We still don't believe it would need to be required. Assuming that we disagree with the Board's claim construction, is a remand required? We don't believe it would be because the factual findings support that the claim structure was present in the art. We do not think that remand is necessary in these circumstances. Okay. And then if I... I know that I'm out of time, but if I can... Well, I'm giving you a little bit back because I'm giving him back. So we'll give you a couple minutes. Okay, would we be able to address our appeal on rebuttal? Yes. Okay, thank you. No, you can do it right now. I'm sorry. No, I'm sorry. No, you can do it right now. Okay, thank you. Is that okay with you? Thank you. We believe that the Board erred in reversing the examiner's rejections of claims 1 through 4 of the 302 patent. Like all the other claims of the 302 and the 022 patent, claims 1 through 4 are directed to the same subject matter, including the rudimentary port structure that is claimed. The relevant structure with respect to these claims is the housing that includes a housing base and how that defines the reservoir. Does ISOMED have a housing base? It does, Your Honor. Actually the easiest way to think about it is if we look at ISOMED and it's in the record at Appendix 606. Okay, now the Board found it didn't have a housing base, right? Board found it didn't have a housing base in claim 1. However, with respect to claim 5, where the Board upheld the examiner's rejections, the Board concluded that ISOMED has a housing. They specifically concluded that the Board's specification, including Figure 1B of the specification, teaches that the housing is comprised of a cap and a base. And then they said that the entirety of ISOMED's titanium shell defines the reservoir. But then, for some reason, when it got to claim 1, it said that ISOMED, which it had already found, has a housing and already said the housing has to include a housing base. For some reason, they said that ISOMED doesn't have a housing with a housing base. But if we look at Appendix 606, we can see what the Board pointed to as ISOMED's housing. It's simply the titanium shell. It has a top portion and the bottom portion. The bottom portion is its base. The bottom portion has an outwardly facing bottom surface, just as in the claim. And it has an inwardly facing surface that defines the reservoir. So we're looking at this little submarine-like figure? Yes, that is ISOMED. But isn't the basic problem here, if you look at below the... I don't even know how to describe these things. There's two long rectangular spaces with a line between them. And the thing at the bottom, right in the middle, that line in the bottom, goes up and down and up and down according to how the pump is working. So that's the bottom of the reservoir, but not necessarily the housing base. Or do I have that backwards? I think I'm remembering that was the key point the Board said, you want to equate those, and the Board said, we don't really see that you've proven that those should be equated. The Board did get hung up on that partition. But hung up suggests it was something... That it didn't agree with you. It didn't. You're correct. But we believe that the Board's error was in trying to find that partition in the claims, rather than looking at the claims and trying to find the elements in ISOMED. So if we look, actually, there's two reservoirs in ISOMED. There's what's labeled as the Reservoir Propellant Chamber, and the Drug Reservoir. The claims actually say that the housing base has to define at least one reservoir. There's no reason for the Board to have limited that reservoir to only the top reservoir and not the bottom reservoir. That ISOMED is a more complicated structure with multiple reservoirs that, as your owner pointed out, move up and down, doesn't mean that it doesn't also teach the same structure that's actually disclosed in BARD's patents. Thank you. You have five minutes for your rebuttal and your response to the cross-appeal. May I address something on the other argument as well? Yes, yes. I mean, it's both. You have a total of five minutes for both. Yes, understood. Thank you very much. With respect to the one issue that was raised, we still say that this distribution of the manual did not go to one of ordinary skilled in the art. I believe the Blue Calypso case does require that artisan to be one of ordinary skilled. Am I remembering that this particular point about who the skilled artisan is, is made only in your reply brief, not in your opening brief? I believe that I don't remember that your opening brief said, and another problem with the Board's decision is they were looking at it from the wrong perspective. Your Honor, you may be right. I don't remember as I stand. Can I ask you, if the case were to go back and the Board were to inquire into whether the Medtronic product was, I'm going to use a loose term, widely distributed and whether it was a general practice, either in the industry as a whole or for Medtronic, to include with these very sensitive medical devices serious instruction manuals, are you prepared to contest those propositions? Or are we talking about a kind of, there isn't something in the record, but it's obvious what the real world would be. Your Honor, as I stand here, I have no idea what Medtronic's policy was at that time with this particular problem. What about your client's general policy? Do you, obviously you don't know about Isomed's particular, I mean, your client wouldn't, your client probably does know how many Isomed products were out there, but in terms of general practices of distributing or not distributing manuals with medical devices? It really depends on the products a lot. Especially very large manuals, such as the Isomed comes in packaging and many of the products that I'm familiar with are much more abbreviated. So you think there might actually be a real factual issue to consider? There may be a real factual issue. And what is your answer to the fact that what was said in GoPro was that it doesn't actually have to be publicly accessible, it just has to be, I mean, it doesn't have to actually be publicly accessed, it just has to be accessible. Right. Well, again, I think to be accessible you have to be able to find it if you're looking for it for that purpose. And I haven't seen no evidence that that is the case particularly with one of ordinary skill in the art. If I may, there was also a reference made here that, to the Jones reference, that wasn't power injectable either and I just want to make that clear and I think Your Honor raised the very fact of what happened in the prosecution history here, the amendment of the claims to add this is power injectable was to specifically overcome the Jones prior art which was not shown as power injectable. There's nothing to show anything in the history here was power injectable. What is your response to your friend on the other side said it doesn't really matter if it's power injectable, it matters if you've disclosed sort of the structure of a port generally. Well that would be an awful dangerous thing in the real world Your Honor because there are ports that are conventional, there are ports that are power injectable today in today's world and you do not power inject the ones that are the conventional ones which may have a symptom in a body and all those things. Are there structural differences between power injectable ports and ports that aren't power injectable? I assume there must be. There are in terms of just like anything else you know, there are many containers for pressurized things some are of a different strength than others have different reinforcement whatever, different welds so that is a factor that has to be looked at here in determining whether these ports are okay to put in high volume contrast in a short period. An alternative way that this could have been claimed would be by putting the power injection limitation in the preamble for example? It could have been. Then there would be also a question there I guess as to whether that had weight whether it you know sufficiently put life and body into the claim, right? Well it could, but I would suggest here your honor that where it says it is power injectable and refers to the assembly which is that preamble, that I think the plain meaning of is is is, it has to be that way. The crucial word is not indicate. Yes Miller the figures indicated that this was one cup and it was false. It was actually half a cup, right? That was the whole point of Right, well they indicated one cup but it was false, but they indicated something which the person reading it could see. Here, what's indicated is with that radio opaque alphanumeric indicator that it's power injectable. So it's the same as Miller in that sense, except it's one step different because here you have to have an x-ray read it first before the person could see it. Except this panel won't take judicial notice of the fact that women can't handle fractions. It would be good for me. But before you sit down on the cross appeal, I hit your friend on the other side with basic grammar there's a comma in the claim. And so why isn't it correct that defining only modifies one reservoir as opposed to the bottom wall? Well, your honor, I think if you look at claim three for example, can't read it that way. That dependent claim I think makes it clear. So I don't think you can read that. I think you're out of time. Thank you, your honor. Can I ask one question? I just wanted to ask you. She's not out of time. How do you distinguish King and AstraZeneca? Which are printed matter cases dealing with a drug or a method of using a drug with instructions on how to use the drug that could be you know, that presumably the person taking the medication should know they're important. Much like it's important that the physician know that a port is power injectable. How do you distinguish those cases which held that there wasn't a functional relationship between the printed matter and the substrate? In those cases, effectively whether you have the printed matter out here in a box or in a kit or not, doesn't really matter. It's just telling you. But what is the function that the claim teaches you? It's a function of a claim to make something that can be seen implanted in the body. Those instructions here are in that case tell you don't use the drug or something. It says take it with food I think and it will have a better use in the body. Which has really nothing to do with what would be the claim. But it's a claim method a method of taking the drug administering the drug. Here you've got a claim structure and you've got a label that tells the doctor how to use it. How does that change the structure? Because it's part of the structure to begin with. And the function of it is to tell you it's safe to power inject. So I think that it's more than just written instruction. There could be a written instruction saying that comes with a vascular access port that says don't power inject this or you can power inject this. But here it's something that's part of the substrate that shows up on an x-ray so you're not having to go look at medical records or anything like that. If you had a pill and you printed 10 mg on it exactly the same look, color, weight, feel as the 5 mg one. Does putting 10 mg on it count? 10 mg on it counts. It's not separate so it's not like the other ones on a piece of paper. It's actually on the device. Isn't that remarkable? You actually put the identifier on the thing itself because that's the last thing the user sees. It's a really good place to put it. And so the previous pill in the prior art, now you would count for patentability the on the device label I have 10 mg of the medication of the active ingredient. So if the prior art is on the formula and this is an indicator of the proper dose or something like that it could have a functional relationship in that case that doesn't exist with the prior art. Okay. Alright, thank you. Case will be submitted. Oh yeah, I'm sorry, she gets a rebuttal on the cross appeal. Briefly. Sorry about that. I'll be brief, your honors. That's okay. With respect to the printed publication issue, I believe that we have... No, you can't. You're only on the cross appeal. Oh, I apologize. That's okay. With respect to the cross appeal, claim 3 just requires that the marker be placed on an outwardly facing bottom surface and Isomed's titanium shell has an outwardly facing bottom surface. Does it say outwardly facing bottom surface of the base? Of the housing base, yes, your honor. And we believe that the lower portion of Isomed is the housing base. And in any event, this exact structure was already disclosed in the Jones patent. Okay. Thank you, your honors.